FILED
5/8/2024 10:30 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Phyllis Vaughn DEPUTY

Case 3:24-cv-01475-L   Document 1-5   Filed 06/14/24   Page 1 of 40   PageID 22

DC-24-06658

Case No. _____

| | | |
|---|---|---|
| PORCH.COM, INC., | § | IN THE DISTRICT COURTS |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | FOR DALLAS COUNTY, TEXAS |
| | § | |
| ARTHUR J. GALLAGHER & CO., | § | |
| GALLAGHER RE INC. f/k/a WILLIS RE INC. | § | 160th |
| | § | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Porch.com, Inc. ("Porch"), on behalf of itself and its wholly owned subsidiaries Homeowners of America Insurance Company ("HOA") and Homeowners of America Holding Corporation ("HOAHC"), files this Original Petition against Defendants Arthur J. Gallagher & Co. and Gallagher Re Inc. (collectively, "Gallagher" or "Defendants").

## INTRODUCTION

1. HOA is a property and casualty insurance company that entrusted Gallagher—one of the largest and purportedly most sophisticated insurance and reinsurance companies in the world—with the critical task of securing and administering a reinsurance facility that would guarantee HOA's ability to meet its policyholders' insurance claims. But despite collecting millions of dollars in brokerage and administration fees from HOA and repeatedly informing HOA that its reinsurance facility was backed by a reliable letter of credit, the truth has since become clear: Gallagher utterly failed to meet its most basic obligations to HOA under the parties' contract and Texas law. Gallagher's contractual breaches and professional malfeasance caused HOA to suffer catastrophic losses when the reinsurance facility Gallagher arranged and administered suddenly went up in smoke.

> **EXHIBIT 3**

1

2.      Since 2017, Gallagher has served as HOA's reinsurance intermediary charged with securing, negotiating, and administering reinsurance coverage governed by Texas law.[1] During its relationship with HOA, Gallagher received many millions of dollars in fees and commissions in exchange for its agreement to fulfill its brokerage and administrative obligations in accordance with Texas insurance laws and the customs and practices applicable to reinsurance brokers.

3.      In late 2021, because of the impending expiration of HOA's existing coverage, Gallagher was responsible for identifying, negotiating, and securing new reinsurance coverage to enable HOA to manage its risks and avoid catastrophic losses. Gallagher's Texas-based Executive Vice President who managed the parties' relationship, Allen Cashin, identified and negotiated a new reinsurance facility for HOA that involved a "segregated account" operated by White Rock Insurance (SAC) Ltd., a Bermudian AON subsidiary, and Vesttoo Ltd., an Israel-based insurance financing company that was to raise funding for the coverage. Critically, under the contract Mr. Cashin negotiated, performance of the reinsurance obligations was to be guaranteed by a $228 million letter of credit issued by a bank approved by the National Association of Insurance Commissioners ("NAIC") Securities Valuation Office. Based on its trust that Gallagher used its expertise in the reinsurance brokerage field to competently perform its obligations and Mr. Cashin's assurances that he had obtained the reinsurance program HOA needed and that it was backed by a valid letter of credit from an NAIC-approved institution, HOA executed the reinsurance contract on January 1, 2022.

4.      All seemed fine. Throughout 2022, HOA continued to rely on Gallagher's performance of its obligations as HOA's reinsurance intermediary as Gallagher provided

---

[1] Gallagher has served in this capacity through contracts HOA entered with Willis Re Inc., to which Gallagher is now the successor-in-interest, and through the Gallagher Re business, through which Gallagher now conducts its reinsurance business operations.

administrative services in connection with the 2022 reinsurance contract and negotiated a renewal of that contract for 2023. In its capacity as the administrator of HOA's reinsurance facility, Gallagher authorized the release of $25 million from the segregated reinsurance account and assured HOA it could do so because the supposed letter of credit guaranteed future reinsurance obligations. Gallagher also was responsible for obtaining a new, larger letter of credit in connection with the renewal of the reinsurance coverage in 2023, for which Gallagher received substantial additional commissions.

5.      Unbeknownst to HOA, the reinsurance coverage obtained by Gallagher was completely illusory. In July 2023, media reports circulated that letters of credit backstopping Vesttoo-arranged reinsurance facilities were fraudulent. Vesttoo suddenly filed for bankruptcy and China Construction Bank, the purported issuer of the letters of credit that were supposed to guarantee HOA's reinsurance facility, claimed it had not authorized any letter of credit, and thus refused to honor them. Without a valid letter of credit, HOA's reinsurance facility offered no reinsurance at all. The segregated reinsurance account only held money that HOA had put into it—minus the $25 million that Gallagher had authorized to go out the door. As a result of the implosion of its reinsurance facility—which was revealed to be worthless—Porch lost over $100 million as it was forced to terminate HOA's reinsurance contract, scramble to replace it, and pay tens of millions of dollars in claims that should have been reinsured.

6.      Those losses would not have occurred if Gallagher had fulfilled its obligations as a reinsurance broker. Under its contracts with HOA, Gallagher agreed to provide "all servicing duties customarily performed by a reinsurance intermediary-broker after the placement of the reinsurance contract." Texas Insurance Code § 4152.152(1), which sets forth the standard of care applicable to Gallagher's performance of its contractual obligations, further requires that, unless

the insured releases the broker in writing from its obligations (which HOA never did), a broker that places reinsurance is required to "exercise due diligence in inquiring into the financial condition of the reinsurer."

7.     If Gallagher had fulfilled its basic obligations as a reinsurance broker, HOA could and would have obtained alternative coverage that would have served its business needs and enabled it to avoid the enormous losses it sustained in 2023. By grossly mismanaging the brokerage and administration of HOA's reinsurance, in breach of its contractual obligations, Gallagher saddled HOA with an illusory reinsurance facility backed by a worthless letter of credit, contrary to Gallagher's assurances that it had been issued by a well-capitalized financial institution.

8.     Far from using reasonable diligence in procuring and administering HOA's reinsurance, as required under Texas law and under the parties' contracts, Gallagher affirmatively put HOA in harm's way. Gallagher ignored critical red flags that would have warned any reasonably diligent insurance broker that the reinsurance contract arranged by Vesttoo and purportedly backed by a letter of credit issued by China Construction Bank was unreliable. Despite a clear contractual obligation to obtain written evidence of China Construction Bank's agreement to guaranty reinsurance risk directly from China Construction Bank, Gallagher failed to do so, both in late 2021 when the 2022 contract was negotiated and in late 2022 when it secured the renewal contract and a new letter of credit for 2023.

9.     Gallagher also breached its contractual obligation by turning a blind eye to red flags and assuring HOA that it could permit Vesttoo's withdrawal of $25 million from its reinsurance facility on the basis that the account was secured by a letter of credit—when in fact it was not secured by any letter of credit at all.

4

10.     Gallagher's failures have severely damaged Porch. The reinsurance facility that Gallagher procured and purported to administer for HOA imploded—as any reasonably diligent reinsurance broker and servicer would have predicted—and Porch was left holding the bag. Because of Gallagher's breaches, Porch has sustained more than $100 million in losses, including the loss of funds released from the reinsurance account as a result of Gallagher's authorization and failure to perform due diligence, the costs of losing its expected reinsurance coverage, the costs of alternative insurance coverage, the payment of millions of dollars in unearned commissions to Gallagher, the precipitous decline in Porch's enterprise value from the crisis, the costs of heightened regulatory supervision, and attorneys' fees that will total millions of dollars through trial. By this action, Porch seeks to recover those losses from Gallagher.

## DISCOVERY CONTROL PLAN

11.     This case should be governed by Discovery Control Plan Level 2.

## PARTIES

12.     Plaintiff Porch.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Homeowners of America Insurance Company (HOA) is a wholly owned subsidiary of Homeowners of America Holding Corporation (HOAHC), which is in turn a wholly owned subsidiary of Porch.com, Inc. In September 2023, Porch.com, Inc. acquired all right, title, and interest in HOA's claims against Gallagher arising out of or in connection with the Quota Share Reinsurance Agreement and associated letter of credit that Gallagher secured, negotiated, and administered for HOA.

13.     Defendant Arthur J. Gallagher & Co. ("AJG") is a foreign corporation formed and exiting under the laws of Delaware. On December 1, 2021, AJG completed the purchase of the Willis Re reinsurance business operations from Willis Towers Watson for an initial purchase price

of $3.25 billion, plus additional payments that could total another $750 million depending on the performance of the business. Upon its purchase of the Willis Re business, AJG assumed the contractual obligations Willis Re Inc. owed under its contracts with HOA and began operating its reinsurance business through Gallagher Re Inc., a wholly owned subsidiary whose financial results are consolidated with AJG's financial results.

14.     AJG, at all times material to this action, has engaged in business in Texas as more particularly described below. AJG maintains multiple places of regular business in Texas. AJG's website, ajg.com, touts that AJG maintains nineteen offices in Texas, including one in Dallas at 12750 Merit Drive, Suite 1000. The cause of action against AJG asserted arose from and is connected with purposeful acts AJG committed in Texas, as described more fully below. Accordingly, AJG may be cited by serving the Secretary of State of Texas provided that the citation and petition are forwarded to AJG's home office address, The Tower, Golf Road, Rolling Meadows, Illinois, 60008 by registered, certified mail, return receipt requested. AJG may also be personally served in Texas through its Texas registered agent(s). AJG recently began listing the Texas Secretary of State as its registered agent in its Texas Franchise Tax Public Information Reports. Prior to these listings, AJG listed as its registered agent the Prentice-Hall Corporation System, Inc. at 211 E. 7th Street, Ste. 620, Austin, Texas 78701.  AJG lists its principal office with the Texas Secretary of State as 2850 Golf Road, Rolling Meadows, Illinois, 60008 and its address for forwarding as "The Tower, Golf Rd., Rolling Meadows, IL 60008."

15.     AJG is a global insurance brokerage and risk management services company with operations throughout the world and substantial operations in Texas, including at its nineteen offices. AJG's stock is publicly traded on the New York Stock exchange and the company has a market capitalization in excess of $50 billion.

16.     Defendant Gallagher Re Inc. is an authorized insurance and reinsurance intermediary domiciled in New York with its principal place of business at 300 Madison Avenue in New York, New York. Gallagher Re Inc. is registered to do business in Texas and may be served through its Texas registered agent as follows:

Gallagher Re Inc.
c/o C T Corporation System
1999 Bryan St., Suite 900
Dallas, TX 75201-3136

Service is requested at this time.

### JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction because the amount in controversy exceeds the Court's minimum jurisdictional requirement, exclusive of interest and costs.

18.     This Court has personal jurisdiction over AJG under Texas Civil Practice and Remedies Code § 17.042 because (a) AJG contracted with HOA and HOAHC, Texas residents, through the November 6, 2017 Reinsurance Intermediary Authorization Agreement ("RIAA") and January 1, 2019 Relationship Dividend Agreement ("RDA") it assumed from Willis Re Inc. following its purchase of the Willis Re insurance business; (b) AJG's contractual obligations to HOA were to be performed in Texas; and (c) Texas-resident employees of AJG or its intermediaries in Texas, including Mr. Cashin, were responsible for AJG's performance of its obligations to HOA. AJG also avails itself of the judicial system in Texas, and expressly consented to suit in this Court and to the application of Texas law in the RDA it assumed from its predecessor-in-interest Willis Re Inc., which provides that the parties "shall submit to the jurisdiction of the state and federal courts of the State of Texas, County of Irving, for the resolution of any and all disputes arising from the interpretation or enforcement of this Agreement." The RDA further provided that all notices under the contract be delivered to the parties' respective addresses in

Texas. In assuming these contracts from Willis Re Inc., AJG deliberately entered contractual relationships centered in Texas. AJG then proceeded to fulfill its obligations under the contracts in Texas, as Mr. Cashin—who was responsible for AJG's performance of its obligations under the RDA and RIAA—conducted business and sent email correspondence from AJG's corporate office at 12750 Merit Drive in Dallas, Texas.

19. This Court has personal jurisdiction over Gallagher Re Inc. under Texas Civil Practice and Remedies Code § 17.042 because, among other things, Gallagher Re Inc. is registered to do business in Texas, and conducts substantial business in the state of Texas and in Dallas County, maintaining an office at 15305 North Dallas Parkway, Suite 1200, Addison, Texas.

20. Venue is proper in Dallas County under Texas Civil Practice & Remedies Code § 15.002(a)(1) because all or a substantial part of the events giving rise to the claim occurred in Dallas County.

21. Plaintiffs seek monetary relief exceeding $1,000,000 under Tex. R. Civ. P. 47.

## FACTS

### I.   HOA Hires Gallagher Re to Obtain a New Reinsurance Contract

22. HOA is a property and casualty insurance provider based in Texas. It provides insurance solutions to consumers in 21 U.S. states.

23. Reinsurance is insurance that an insurance company like HOA purchases to manage its ongoing risks and insulate itself from the risk of a major claims event.

24. In November 2017, HOA entered into a Reinsurance Intermediary Authorization Agreement ("RIAA") with Willis Re. A copy of the RIAA is attached as Exhibit A. Under the RIAA, HOA authorized Willis Re "to procure and administer reinsurance" on its behalf. In paragraph 13 of the RIAA, Willis Re agreed to provide "administrative services" in connection

with reinsurance it procured for HOA. The contract broadly defines "administrative services" as follows:

"Administrative Services", as used herein means all servicing duties customarily performed by a reinsurance intermediary-broker after the placement of the reinsurance contract, including but not limited to: 1) preparing and handling, through completion of the signing process, reinsurance contracts and any addenda thereto; 2) processing all notices received; 3) subject to applicable law and the terms and conditions of Section 11 of this Agreement, reporting and collecting all valid claim payments requested by the Company; 4) administering all open claims, claims which become reopened and claims yet to be reported by the Company and 5) administering all reserve funding. Administrative Services will be provided subject to applicable law and the terms and conditions of Section 11 of this Agreement.

25.     Later, in 2019, HOAHC entered a Relationship Dividend Agreement ("RDA") with Willis Re Inc. The RDA established Willis Re as HOA's "broker of record for placing reinsurance for and in connection with certain HOA business."

26.     Following AJG's purchase of Willis Re and its business operations, AJG's reinsurance business division was renamed "Gallagher Re." In connection with the acquisition, AJG assumed Willis Re's obligations under the RIAA and the RDA, and AJG's Gallagher Re division continued to act as HOA's reinsurance broker.

27.     In late 2021, HOA needed a new reinsurance contract to keep up with the growth in its business. Because its existing reinsurance contracts were expiring on December 31, 2021, HOA needed to secure the new reinsurance facility by January 1, 2022, to avoid any lapse in its reinsurance coverage.

28.     HOA trusted and relied on Gallagher to procure its reinsurance because of Gallagher's established expertise with reinsurance and status as one of the largest global reinsurance brokers. Gallagher's website touts its status as "a full-service global reinsurance brokerage firm" and promises that "[a]cting as a trusted advisor to our clients, we have the experience and expertise to provide clients with tailored reinsurance programmes."

29.     Gallagher undertook to procure a new reinsurance facility for HOA to become

effective as of January 1, 2022. Mr. Cashin, an Executive Vice President in the Gallagher Re business division, led the brokerage transaction along with a team of colleagues.

## II.   **Gallagher Grossly Mismanages the Reinsurance Process in 2021.**

30.   Gallagher introduced HOA to Vesttoo, an Israeli start-up company and self-described "insurance marketplace."

31.   On information and belief, Gallagher had conducted minimal or no investigation into Vesttoo, its officers, or its business partners before identifying Vesttoo as a prospective provider of reinsurance to HOA. On information and belief, Mr. Cashin and his team had never previously placed reinsurance with Vesttoo for any other client.

32.   Vesttoo proposed to provide reinsurance through a specialized financial arrangement set up by the White Rock Group ("White Rock"), which is a subsidiary of Aon plc, an international insurance services firm.

33.   When Gallagher sought to offer its own services in arranging the transaction, using its Artex business unit instead of White Rock, red flags quickly emerged. On information and belief, Vesttoo insisted on using White Rock to facilitate the transaction and refused to complete the Know Your Customer ("KYC") process that Gallagher sought to have Vesttoo complete. That Vesttoo refused to work with Gallagher to structure the transaction even though Gallagher's Artex business unit offered capabilities comparable to those of White Rock, and that Vesttoo would not complete its KYC process, was an early warning about Vesttoo that Gallagher should have heeded and that should have prompted Gallagher to conduct further due diligence regarding the ability of Vesttoo and White Rock to fulfill their obligations.

34.   Nonetheless, on HOA's behalf, and without conducting any meaningful further due diligence, Gallagher engaged with both White Rock and Vesttoo to set up a quota share reinsurance

contract for HOA. Quota share reinsurance contracts are pro-rata reinsurance contracts in which the insurer and reinsurer share premiums and losses arising under a book of insurance policy business according to a fixed percentage from the first dollar of loss.

35.     Under the Quota Share Reinsurance Contract, Willis Re was expressly designated as the "intermediary" responsible for negotiating the contract and through which "all communications" relating to the contract were to be transmitted:

### INTERMEDIARY

Willis Re Inc. is hereby recognized as the intermediary negotiating this Contract and through whom all communications relating thereto shall be transmitted to the Company or the Reinsurer. Payments by the Company to Willis Re Inc. shall be deemed to constitute payment to the Reinsurer and payments by the Reinsurer to Willis Re Inc. shall be deemed to constitute payment to the Company only to the extent that such payments are actually received by the Company.

36.     AJG became responsible for those intermediary obligations through its purchase of Willis Re and its assumption of liabilities under the contracts executed by Willis Re in connection with the reinsurance business that became Gallagher Re.

37.     As arranged by Gallagher, White Rock, and Vesttoo, the Quota Share Reinsurance Contract for HOA contemplated that reinsurance would be provided through a "segregated account" created under Bermudan law. The segregated account facility would receive a portion of the premiums HOA received from its insureds and would make payments out to HOA to share losses on HOA's insurance policies under set circumstances. To ensure that adequate reinsurance funds were available, the Quota Share Reinsurance Contract provided that a third-party bank would supply a letter of credit guaranteeing the availability of funds that could be drawn down to pay claims.

38.     As Gallagher fully recognized, and as the Quota Share Reinsurance Contract

expressly required, the viability of this reinsurance arrangement hinged on obtaining a valid letter of credit from a trustworthy bank because that bank would guaranty the payment of reinsurance funds in the event of a major claims event and validate the ability of the reinsurance facility to meet its obligations. To ensure that the issuing bank would be trustworthy, the contract required the bank to either be a member of the Federal Reserve System or to be "approved for use by the NAIC Securities Valuation Office." Quota Share Reinsurance Contract Art. XXVI.C.

39.     Gallagher took the lead in negotiating the Quota Share Reinsurance Contract for HOA with Vesttoo and White Rock.

40.     Despite needing to have the new reinsurance facility in place by midnight on December 31, 2021, Gallagher waited until the last minute to substantively negotiate the reinsurance contract with Vesttoo and White Rock.

41.     Just days before the deadline, on December 27, 2021, Cashin sent HOA a draft Quota Share Reinsurance Contract from Vesttoo and White Rock with Gallagher's proposed edits. Appendix B to the draft contract, titled "LOC Form," contained a template for a "collateral letter" that promised to obtain an actual letter of credit from a "NAIC Complaint Bank," albeit no actual letter of credit. As drafted by Vesttoo and White Rock, Appendix B stated that "China Construction Bank" would provide the required letter of credit—but gave no indication as to what China Construction Bank entity would be issuing the letter of credit. The only China Construction Bank entity approved by the NAIC Securities Valuation office is the New York Branch.

42.     Evidently concerned by the prospect of China Construction Bank issuing the letter of credit for HOA, Cashin's redline edits (shown in purple font below) replaced "China Construction Bank" with "HSBC Bank USA, National Association":

DEAR SIRS/MADAMS,

RE: COLLATERAL LETTER

AS PER VESTTOO BAY XVII LP (HEREINAFTER "VB XVII") REQUEST, WE, THE NAIC COMPLIANT BANK (HEREINAFTER "THE BANK") CONTINGENT TO THE CONDITIONS PRECEDENT AS DETAILED BELOW, CONFIRM THAT WE WILL PROVIDE TO HOMEOWNERS OF AMERICA INSURANCE COMPANY, DEFINED AND DETAILED HERETO IN ANNEX A UNDER THE "~~CORE~~ QUOTA SHARE REINSURANCE CONTRACT", A LETTER OF CREDIT (HEREINAFTER "LOC") ISSUED BY ~~CHINA CONSTRUCTION BANK~~ HSBC Bank USA, National Association ("THE BANK").

43.     Despite being aware as early as December 27, 2021, of Vesttoo and White Rock's intent to use China Construction Bank to supply the requisite letter of credit, Cashin did not specifically alert HOA to this issue. Cashin's cover email to HOA concerning the contract did not mention the issue, and instead affirmatively communicated to HOA that HSBC Bank USA—not China Construction Bank—would provide the letter of credit in the Vesttoo transaction by replacing "China Construction Bank" with "HSBC Bank USA, National Association" in the proposed contract in redline.

44.     Days passed. On information and belief, Cashin failed to confirm with Vesttoo and White Rock that they would accept his edit to replace China Construction Bank with HSBC Bank as the letter of credit issuer.

45.     Then, at 12:16am on December 31, 2021—less than 24 hours before HOA's deadline to have new reinsurance in place—Cashin emailed Vesttoo and White Rock to finalize the reinsurance contract terms.

46.     At 12:04pm on December 31, 2021—with less than twelve hours to go—White Rock responded to Cashin and attached a document with the filename "Signed LOC." The document itself was not a letter of credit and did not even purport to be one. Instead, it was a self-described "collateral letter" from an entity called "Yu Po Finance Ltd" and signed and stamped as "approved" by Xu Yingde, a Senior Vice President at China Construction Bank. The commitment

13

letter stated that **Yu Po Finance** would provide, at some unspecified later date, a letter of credit

issued by **China Construction Bank**, but it gave no indication that this letter would be issued by

the New York branch, as would be required to comport with the contractual requirement for an

NAIC-approved financial institution.

```
   29.12.2021

TO: HOMEOWNERS OF AMERICA

ATTENTION:  WHITE  ROCK  INSURANCE  (SAC)  LTD.  ACTING  IN  RESPECT  OF  ITS
SEGREGATED ACCOUNT T96 - HOMEOWNERS




DEAR SIRS/MADAMS,

RE: COLLATERAL LETTER

AS PER VESTTOO BAY XVII LP (HEREINAFTER "VB XVII") REQUEST WE, YU PO
FINANCE  (HEREINAFTER  "THE  COUNTERPARTY")  CONTINGENT  TO  THE  CONDITIONS
PRECEDENT AS DETAILED BELOW, CONFIRM THAT WE WILL PROVIDE TO HOMEOWNERS
OF AMERICA, DEFINED AND DETAILED HERETO IN ANNEX A UNDR "COLLATERAL
PROTECTION  INSURANCE  CONTRACT",  A  LETTER  OF  CREDIT  (HEREINAFTER  "LOC")
ISSUED BY CHINA CONSTRUCTION BANK ("THE BANK").
```

47.     After receiving this email, at 1:11pm on December 31, 2021, Cashin informed HOA

that "White Rock signed off this morning on allowing China Construction Bank to issue the $228M

LOC." Cashin wrote: "I have a call with White Rock and potentially Vesttoo in the coming hours,

so let me know if you want to join. ***Despite being NAIC compliant, we need to require a more***

***stable credit institution***." Contrary to Cashin's representation, China Construction Bank was not

NAIC compliant (only its New York branch was) and, there was no basis for his assertion that the

signatory to the letter was NAIC-compliant, as there was no indication that any letter of credit

would be issued and approved by the New York branch of China Construction Bank.

48.     Despite his recognition that there was substantial uncertainty as to whether he had

secured a reliable counterparty for HOA, Cashin failed to successfully negotiate any change with

Vesttoo and White Rock or take any further steps to ensure that their obligations under the reinsurance contract would, in fact, be guaranteed.

49.     With that failure, Gallagher had backed HOA into a corner. It was New Year's Eve—hours before midnight—and HOA had one option to obtain the reinsurance it needed by midnight to avoid a lapse in coverage. It had little if any choice but to accept the transaction proposed by Vesttoo, with China Construction Bank as the letter of credit issuer, or suffer a lapse in reinsurance coverage that could expose HOA to catastrophic losses.

50.     Cashin began to push HOA to accept China Construction Bank as the letter of credit issuer. Based on Cashin's email signature, Cashin conducted these offices from his office in Dallas, Texas. Cashin's Dallas office is listed as a location of Arthur J. Gallagher and Co. according to AJG's website, www.ajg.com.

51.     When White Rock sent Cashin the annual report and NAIC listing for China Construction Bank's New York Branch, Cashin forwarded them along to HOA at 3:35pm on December 31, 2021.

52.     After a phone call with Cashin, HOA agreed to proceed with a letter of credit from China Construction Bank because it appeared, based on information Gallagher had provided, to be a well-capitalized financial institution and HOA had no other choice before the midnight deadline.

53.     Also supporting HOA's decision to move forward with the deal was Cashin's representation to HOA that it could change the bank in the new year. Cashin told HOA that it could switch from China Construction Bank as the letter of credit issuer to Citi or UBS, but that it would take three weeks. In an email, an HOA employee wrote to colleagues: "I had another conversation with Allen. Vesttoo is willing to do Citibank and one other US institution but it will take 3 weeks. Best solution is to sign the document and get the White Rock cell on risk and in the email state it

is our understanding that we will have the opporutnity [sic] to replace China Construction Bank with the two US named insitutions [sic] they disclosed to Allen."

54.    Cashin, for his part, covered his tracks. He wrote to HOA, ostensibly from Texas: "I just wish we knew it was CCB before today." Of course, Cashin had known at least as early as December 27—when he affirmatively sought to swap China Construction Bank out for HSBC Bank. But he had failed to follow through with Vesttoo and White Rock to secure that change, let alone notify HOA of the issue.

55.    Having secured HOA's assent on the basis that HOA could quickly replace China Construction Bank as the letter of credit issuer in the new year, Gallagher moved forward with completing the reinsurance transaction by midnight. But Gallagher again failed. Notably—and apparently lost on Cashin and everyone at Gallagher—the final transaction documentation did not include a letter of credit (from China Construction Bank or anyone else).

56.    Instead, the final documentation only included the "collateral letter" from Yu Po Finance. Without an actual of letter of credit, HOA's access to reinsurance funds—and, critically, the guaranty of those funds that the letter of credit was intended to provide—was completely illusory. The segregated account that HOA would look to for reinsurance funds was not actually capable of providing them. Without a letter of credit, it had no collateral to draw on—the account simply stored the premiums that HOA deposited into it as part of the arrangement. Because there was no valid, enforceable, and collectible collateral in the form of a letter of credit (or otherwise), HOA had no reinsurance coverage (beyond the premiums that HOA itself had ceded). No bank was actually on the hook to provide reinsurance funding through a letter of credit in a major claims event. Gallagher had collected millions of dollars in commissions while failing in the most basic aspect of its job—it had not secured either valid reinsurance or a letter or credit guarantying that

reinsurance for HOA at all.

57.     Worse, Gallagher did not realize this and affirmatively assured HOA that everything was in order with its reinsurance and the letter of credit. Even though the "collateral letter" does not even purport to be a letter of credit, Gallagher repeatedly referred to the collateral letter as an "LOC" in emails with HOA.

58.     On January 1, 2022, Cashin emailed HOA the final "signed contract" and repeatedly expressed that Appendix B was the letter of credit, stating that "the CCB LOC obtained by Vesttoo was based on the previously calculation is $228M." Expressing concern that only $228M in funds were available pursuant to the letter of credit, instead of the full $229.3 million HOA needed, Cashin wrote: "please let us know if you want Vesttoo to commit cash to cover the gap until a new LOC can be issued for the correct amount of $229,272,824 as soon as practicable in the new year when the Bank opens." Had a reasonably diligent reinsurance broker inspected the document Cashin told HOA was the "LOC," they would have realized that it was ***not*** a letter of credit for any amount of funds and advised HOA accordingly.

59.     Gallagher's treatment of the collateral letter between an unknown foreign entity—Yu Po Finance—and a Chinese bank—China Construction Bank—as a valid letter of credit from an NAIC-compliant institution wrongly assured HOA that it had obtained valid and reliable reinsurance backed by collateral held by a well-established financial institution, when in fact it had not.

60.     Had Gallagher done its job of ensuring that the reinsurance contract it purported to secure for HOA included a letter of credit—which was critical to validating that the arrangement actually had the capacity to provide reinsurance in a major claims event—it would have realized that the "collateral letter" from Yu Po Finance was not a letter of credit and provided no guarantee

of reinsurance funding in a major claims event and no genuine assurance of the reinsurance facility's financial capacity.

61.     Instead of acting in a reasonably diligent manner by reviewing the purported "letter of credit" and advising HOA that it was not a letter of credit at all, Gallagher attempted to distance itself and deflect responsibility *after the reinsurance contract was signed*. Gallagher sent HOA a boilerplate disclosure form entitled "Willis Re Disclosure Regarding Collateralized Reinsurance" in which Gallagher, despite the absence of any release of its obligations by HOA as required by the Texas Insurance Code, purported to disclaim responsibility for due diligence regarding the Vesttoo segregated account held by White Rock and the sufficiency of the collateral held in that account. Gallagher sought acknowledgement from HOA that "Willis Re has not assessed the collateral required to support obligations in the above contract" and "[t]he above named Reinsurer is not approved by Willis Towers Watson for the risk being placed therefore Willis Towers Watson's policy is to notify its client and obtain authorization to proceed."

62.     Notably, the disclosure form did not even purport to disclaim any responsibilities relating to validating the letter of credit or the reliability and creditworthiness of the entity issuing the letter of credit. The disclosure form did not disclaim Gallagher's basic responsibility as a reinsurance broker to verify that a letter of credit from a financial institution had been obtained and confirm that the institution was NAIC-approved and held assets sufficient to ensure its ability to meet its obligations. Here, Gallagher did not just fail to assess the *sufficiency* of collateral to meet reinsurance needs; it fundamentally failed to make sure that a genuine letter of credit was in place at all.

63.     Likewise, Gallagher's disclosure form did not communicate anything to HOA about any risk associated with relying on a letter of credit from China Construction Bank or

Gallagher's assessment of those risks. The reinsurer that Gallagher's disclosure form stated was "not approved by Willis Towers Watson" was not China Construction Bank but "White Rock Insurance (SAC) Ltd on behalf of its segregated account T96-Homeowners (i.e. Vesttoo)." Gallagher made no disclaimer with respect to China Construction Bank or the purported letter of credit.

64.     Moreover, Gallagher only obtained HOA's signature on the disclosure form on January 3, 2022—*after* Gallagher had consummated the reinsurance agreement with Vesttoo for HOA. The disclosure form states: "If you wish us to proceed to place this policy/contract with the above Reinsurer, please indicate by signing this authorization and returning one copy for our records. A new authorization will be required for each new policy/contract and policy period." Under the express terms of the statement, HOA's authorization on January 3, 2022 meant nothing with respect to the Quota Share Reinsurance Contract that Gallagher had *already* placed for HOA days earlier.

65.     That Gallagher knew—and subsequently disclosed to HOA—that the reinsurance entity set up by Vesttoo was not "approved by Willis Towers Watson" should have underscored for Gallagher the importance of validating the purported letter of credit. But rather than take the step any reasonably diligent broker would have taken and advised HOA that there was *no* letter of credit in place to actually provide reinsurance funds from an NAIC-approved institution—instead just a "collateral letter" from "Yu Po Finance"—Gallagher buried the issue and attempted to cover its tracks by getting HOA to sign its generic disclosure form *after* the deal was done.

### III.    Gallagher Continues to Wrongly Assure HOA It Holds a Valid Letter of Credit.

66.     Throughout 2022, as Gallagher administered HOA's reinsurance facility, Gallagher continued to wrongly assure HOA that it held a valid letter of credit guaranteeing its access to

reinsurance funds.

67.     First, when HOA reached out to Gallagher about replacing China Construction Bank days after the New Year's Eve debacle, Cashin rebuffed the employee's concern. Then, when HOA insisted on pursuing the replacement, Gallagher's efforts to switch from China Construction Bank to a reputable U.S. bank went nowhere. This was another red flag following Vesttoo's promises (and Gallagher's assurances to HOA) that HOA could easily switch to a U.S. bank in the new year. By March 2022, Gallagher was still purporting to work on switching the issuer bank. At some point, Gallagher gave up trying—failing to follow through on its promise that HOA could easily switch the letter of credit issuer to another bank like Citi or UBS.

68.     Second, in late 2022, Gallagher again wrongly assured HOA that its reinsurance facility was reliable. Gallagher, which as part of its administrative services in connection with the reinsurance contract was required to approve any release of funds, informed HOA that Vesttoo had requested to withdraw $25 million from the segregated bank account (which held over $40 million in premiums HOA had deposited), with Cashin writing: "Vesttoo is requesting cash release agreement prior to year-end 2022 in order to offer their investors liquidity." When an HOA employee then questioned whether the account was adequately capitalized to allow for a $25 million withdrawal by Vesttoo, Gallagher sent HOA the collateral letter from Yu Po and again referred to it as an "LOC." Cashin separately wrote: "Treaty Year 2022 still has the $228M LOC as received by HOA, thus the contract is funded to the contract limit and meets Schedule F requirements." This was an egregious failure for Gallagher to make in its role administering HOA's reinsurance facility or to comply with its obligations under the Texas Insurance Code to verify the financial condition of any reinsurer. Any reinsurance broker customarily performing such administrative services would have actually reviewed the purported "$228M LOC" before

signing off on letting $25 million leave the segregated account. And, upon reviewing the document, they would have instantly realized that it was not a letter of credit at all and guaranteed nothing. It was a mere "collateral letter" from an obscure entity named "Yu Po Finance."

69.    In December 2022, Cashin also informed HOA that Vesttoo was preparing a new $300 million letter of credit from China Construction Bank, writing: "For Treaty Year 2023, they are in the process of issuing a new $300M LOC by China Construction Bank." Knowing that HOA preferred a U.S. issuer, Cashin failed to raise an issue with HOA receiving yet another letter of credit from China Construction Bank. And, on information and belief, Cashin did nothing to verify the financial condition of either the reinsurers or China Construction Bank at that time, or to validate that China Construction Bank had actually issued and would stand behind the letter of credit, as a reasonably diligent reinsurance broker would have done.

70.    Cashin then emailed the new letter of credit to HOA on December 30, 2022. Unlike the previous collateral letter from Yu Po Finance, this document was completely different and itself purported to be an official letter of credit from the New York Branch of China Construction Bank. Presented on China Construction Bank letterhead, the new document affirmatively stated that China Construction Bank "hereby establish[ed] this clean, irrevocable, and unconditional Standby Letter of Credit No. CCB462122X in your favor as beneficiary for drawings up to USD 300,000,000." This is shown in the following excerpt of the document:



China Construction Bank

**BANK**
December 30th, 2022

China Construction Bank Corp.
1095 Avenue of the Americas
33rd Floor New York
NY 10036
USA

**Irrevocable**
**Standby Letter of Credit No. CCB462122X**

| Beneficiary: | Applicant: |
|---|---|
| Homeowners Of America Insurance Co.<br>1333 Corporate Dr Ste 260 Irving, TX, 75038-2568 United States | Vesttoo Bay XVII ("VB") on behalf of<br>White Rock Insurance (SAC) Ltd.<br>Acting in respect of its segregated account.<br>Designated as "T96 – Homeowners".<br>c/o Aon Insurance Managers (Bermuda) Ltd.<br>6 Front Street, Hamilton, HM11 Bermuda |
| Date of Issue:<br>December 30th ,2022 | Date and Place of Expiry:<br>Four-years-From-Issuance office of Issuing Bank or any<br>automatically extended date, as herein defined. |

Amount:
USD 300,000,000 (USD Three hundred million).

We hereby establish this clean, irrevocable, and unconditional Standby Letter of Credit No. CCB462122X in your favor as beneficiary for drawings up to USD 300,000,000 (USD Three hundred million). effective immediately. This Standby Letter of Credit is issued, presentable and payable at our office located at 1095 Avenue of the Americas, 33rd Floor New York, NY 10036, USA and expires with our close of business on Four -years-From-Issuance. Except when the amount of this Standby Letter of Credit is increased, this Standby Letter of Credit cannot be modified or revoked without your consent.

71.     That the new "letter of credit" was completely different on its face from the prior one was another red flag—that Gallagher again ignored. Any reasonably diligent reinsurance broker following the customs and practice of the industry who received this letter of credit as a replacement for the prior "collateral letter" from Yu Po Finance would have called to the bank to confirm that the letter was legitimate and had been appropriately authorized. HOA's reinsurance facility had gone without such a letter of credit for the entirety of 2022 to date, and then suddenly new collateral appeared in a completely different format and from a different China Construction Bank entity than had been identified in the original document. Despite this, on information and belief, Gallagher did no investigation into why the form of collateral underpinning HOA's

reinsurance facility had changed so dramatically and now purported to come from the New York branch of China Construction Bank rather than Yu Po Finance.

72.     Had Gallagher exercised reasonable diligence in negotiating, administering and securing HOA's reinsurance at any point in 2022, it would have obtained written confirmation of the financial condition of White Rock and Vesttoo, the reinsurance counterparties. On information and belief, it did neither. As for the required letter of credit, it would have either required the replacement of China Construction Bank as the letter of credit issuer or—failing that—ensured that reliable collateral was in place by obtaining a valid letter of credit (when only the "collateral letter" from "Yu Po" existed) and confirming directly with the NAIC-compliant New York branch of China Construction Bank that it had accepted the risk of reinsurance. But Gallagher did none of this—and instead consistently assured HOA that it had procured reinsurance it could rely on.

## IV.    Gallagher Breaches Its Contract with HOA

73.     Under the RIAA, Gallagher was obligated to obtain confirmation of China Construction Bank's undertaking to provide reinsurance to HOA directly from China Construction Bank.

74.     Section 5 of the RIAA obligated Gallagher to:

Retain for at least ten (10) years such records, in relationship to the reinsurance placed and serviced, as may be required by statute or regulation in the states in which the Company conducts business, including but not limited to:  . . .  **(k) When Willis Re procures a reinsurance contract on behalf of a licensed ceding insurer: Directly from any assuming reinsurer, written evidence that the assuming reinsurer has agreed to assume the risk . . . ."**

75.     This provision compelled Gallagher to obtain ***directly*** from China Construction Bank, as the ultimate payor of reinsurance funds in the Vesttoo transaction, "written evidence" that China Construction Bank had "agreed to assume the risk." Given that, pursuant to the Quota Share Reinsurance Contract that Gallagher procured for HOA, China Construction Bank was

purportedly undertaking to provide over $200 million in reinsurance funding by supplying a letter of credit to the segregated account, China Construction Bank qualified as an "assuming reinsurer" under Section 5 of the RIAA.

76.    On information and belief, Gallagher failed to obtain written evidence directly from China Construction Bank that it had agreed to assume any risk. If Gallagher had fulfilled this duty, such as by contacting the NAIC-compliant New York branch of China Construction Bank directly (or even any non-NAIC compliant branch of the bank) and requesting confirmation that it had accepted the reinsurance risk, Gallagher would have discovered that China Construction Bank disputes the validity of the letter of credit—and HOA could have avoided the colossal losses it has since incurred.

77.    Gallagher breached Section 5(k) both when it first placed HOA's reinsurance contract in December 2021 and again when the policy renewed for a second policy term in December 2022. On information and belief, despite emailing HOA the purported $300 million letter of credit from China Construction Bank on December 30, 2022, Cashin and Gallagher failed to obtain written evidence directly from China Construction Bank Corp.'s New York office, from which the letter of credit purported to be issued, that it had actually issued the letter of credit. Again, had Gallagher fulfilled this express contractual duty, such as by contacting China Construction Bank's New York Branch Office directly and requesting confirmation that it had issued the letter of credit and accepted the reinsurance risk, Gallagher would have discovered that China Construction Bank disputes the validity of the letter of credit—and HOA could have avoided the colossal losses it has since incurred.

78.    Section 11 of the RIAA further obligated Gallagher to "[c]omply with U.S., E.U., U.K. and any other applicable economic or trade sanctions laws." Gallagher breached this

provision by taking actions that violated its duties to HOA under Texas law, including its obligation to use reasonable diligence in attempting to place the requested reinsurance and to inform the client promptly if unable to do so. Gallagher further breached this provision by violating its statutory obligations under the Texas Insurance Code, including Section 512 of Chapter 4152, which obligated Gallagher to "exercise due diligence in inquiring into the financial condition of the reinsurer" and "disclose to the ceding insurer the broker's findings in connection with the inquiry." On information and belief, Gallagher Re did neither.

79.     Section 13 of the RIAA further obligated Gallagher to "Provide 'Administrative Services', as defined below, in connection with reinsurance contracts placed by Willis Re." The RIAA then defined "Administrative Services" to mean "all servicing duties customarily performed by a reinsurance intermediary-broker after the placement of the reinsurance contract, including but not limited to: 1) preparing and handling, through completion of the signing process, reinsurance contracts and any addenda thereto; 2) processing all notices received; 3) subject to applicable law and the terms and conditions of Section 11 of this Agreement, reporting and collecting all valid claim payments requested by the Company; 4) administering all open claims, claims which become reopened and claims yet to be reported by the Company and 5) administering all reserve funding."

80.     Gallagher repeatedly breached its obligation to provide all servicing duties customarily performed by a reinsurance intermediary-broker for HOA, including by failing to act with reasonable diligence in preparing and handling HOA's reinsurance contract with White Rock and Vesttoo, failing to act with reasonable diligence in confirming the reliability and validity of the purported letter of credit from China Construction Bank and obtaining written evidence of the reinsurers' ability and willingness to assume the required risks, ignoring red flags about the unreliability of the collateral letter from Yu Po Finance, assuring HOA that its reinsurance facility

held a valid and reliable letter of credit when in fact it did not, assuring HOA that it could safely permit the withdrawal of $25 million from its segregated account, and failing to confirm directly with China Construction Bank's New York branch that it had issued a letter of credit to HOA and would honor it.

### V.    HOA suffers severe damages as a result of Gallagher's misconduct.

81.    In July 2023, media outlets began reporting that letters of credit used in Vesttoo transactions were invalid. When HOA then did what Gallagher had been contractually required to do all along—contact China Construction Bank to confirm the validity of its letter of credit— China Construction Bank denied that it had ever issued it.

82.    Facing sudden risk of loss and dramatic undercapitalization, HOA immediately began taking steps to protect its business. HOA had no choice but to terminate its reinsurance contract with Vesttoo because—despite the millions of dollars HOA had paid Gallagher to procure valid and reliable reinsurance funding—its contract offered no reinsurance at all. Porch recognized a charge of $48.2 million in its Q2 2023 financials to account for this loss. HOA then had to replace its reinsurance coverage at significantly higher cost, and further recognized a loss of surplus capital of $25 million.

83.    This immediate financial impact was not all. HOA's sudden loss of reinsurance also caused its regulator, the Texas Department of Insurance, to place HOA under temporary supervision, leading to additional costs, regulatory burdens, and reputational damage. In addition, HOA was unable to launch a new reciprocal insurance entity as planned in September 2023 because of the new supervisory requirements from the Texas Department of Insurance.

84.    Then, to stabilize HOA, Porch was compelled to invest $57 million of cash to strengthen HOA's balance sheet. This commitment of capital prevented Porch from consummating

transactions that would have de-levered its balance sheet and permitted it to eliminate debt at an advantageous price.

85.     The crisis also had a material effect on the enterprise value of Porch Group, the public-traded parent company of Porch.com, Inc., as its public stock price dropped over 40% in the weeks after the fact that HOA's reinsurance facility was arranged by suddenly-bankrupt Vesttoo became public knowledge.



86.     But for Gallagher's breaches of its obligations under the RDA and Texas law in leading HOA into and perpetuating its reinsurance facility with Vesttoo—ignoring numerous red flags that would have prompted any reasonably diligent insurance broker to procure different coverage for HOA—Porch would have never been in this mess.

87.     Likewise, HOA would have avoided its colossal losses if Gallagher had simply complied with its basic contractual obligation to obtain written confirmation directly from the

purported ultimate reinsurer—China Construction Bank's New York branch—that it had undertaken a $300 million risk. But Gallagher failed to fulfill its duties to HOA in all respects—to HOA's severe detriment.

## CAUSES OF ACTION

### COUNT I: BREACH OF CONTRACT

88.     Plaintiffs repeat and reallege the allegations of the above paragraphs as if fully set forth herein.

89.     On November 6, 2017, Defendant entered the RIAA with HOA. The RIAA is a valid contract.

90.     Section 5 of the RIAA obligated Gallagher to obtain written confirmation of China Construction Bank's undertaking to provide reinsurance to HOA directly from China Construction Bank.

91.     AJG, which assumed Willis Re's obligations under the RIAA upon its acquisition of the Willis Re business, knew that, as the purported issuer of a letter of credit, China Construction Bank was responsible for providing hundreds of millions of dollars in reinsurance funds to HOA under the Quota Share Reinsurance Contract that Gallagher negotiated.

92.     On information and belief, Gallagher breached Section 5 of the RIAA because it did not contact China Construction Bank directly and did not procure directly from China Construction Bank any commercially reasonable evidence that China Construction Bank, and in particular its NAIC-approved New York branch, had agreed to assume the risk of paying hundreds of millions of dollars upon the letter of credit to guaranty the performance of the Vesttoo facility's obligations.

93.     Section 11 of the RIAA obligated Gallagher to "[c]omply with U.S., E.U., U.K. and

any other applicable economic or trade sanctions laws" in connection with its services to HOA. Gallagher breached this provision by taking actions that violated its duties to HOA under Texas common law and the Texas Insurance Code, as described above.

94.     Section 13 of the RIAA obligated Gallagher to "Provide 'Administrative Services', as defined below, in connection with reinsurance contracts placed by Willis Re." Such "Administrative Services" included "all servicing duties customarily performed by a reinsurance intermediary-broker after the placement of the reinsurance contract." Gallagher repeatedly breached its obligation to provide all servicing duties customarily performed by a reinsurance intermediary-broker for HOA, including by failing to act with reasonable diligence in preparing and handling HOA's reinsurance contract with White Rock and Vesttoo, failing to act with reasonable diligence in confirming the reliability and validity of the purported letter of credit from China Construction Bank, ignoring red flags about the unreliability of the collateral letter from Yu Po Finance, assuring HOA that its reinsurance facility held a valid and reliable letter of credit when in fact it did not, assuring HOA that it could safely permit the withdrawal of $25 million from its segregated account, and failing to confirm directly with China Construction Bank that it had issued a letter of credit to HOA and would honor it.

95.     HOA has fully complied with all terms of the RIAA, including payment of millions of dollars of fees and commissions to Gallagher for its reinsurance brokerage and administrative services conducted pursuant to the RIAA.

96.     HOA has incurred substantial damages as a result of Gallagher's breaches of Sections 5, 11, and 13 of the RIAA. Had Gallagher complied with Sections 5, 11, and 13 of the RIAA, including by directly contacting China Construction Bank to obtain written evidence of its undertaking to pay hundreds of millions of dollars to HOA under the Quota Share Reinsurance

Contract, and confirm the validity of the purported letter of credit from China Construction Bank, HOA's substantial losses could have been avoided. Had Gallagher performed its obligations under the RIAA, HOA could have avoided entering the reinsurance transaction with Vesttoo in the first place and/or taken action to find alternative reinsurance and avoid the substantial damages HOA ultimately incurred.

## PRAYER

WHEREFORE, Plaintiff prays that this Court enter a final judgment awarding the following relief:

A.     Judgment in Plaintiff's favor and against Defendants on all causes of action alleged herein;

B.     Monetary damages in an amount to be determined at trial;

C.     Exemplary and punitive damages;

D.     Pre-judgment and post-judgment interest;

E.     Attorneys' fees, costs and expenses; and

F.     Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury.

Dated:  May 8, 2024

Respectfully submitted,

SUSMAN GODFREY, L.L.P.

By:    /s/  *Daniel Wilson*
       Stephen E. Morrissey
       *Pro Hac Vice Motion Forthcoming*
       smorrissey@susmangodfrey.com
       Kemper Diehl
       *Pro Hac Vice Motion Forthcoming*
       kdiehl@susmangodfrey.com
       Daniel Wilson
       State Bar No. 24070859
       dwilson@susmangodfrey.com
       1000 Louisiana Street, Suite 5100
       Houston, Texas 77002-5096
       Telephone: (713) 651-9366
       Facsimile: (713) 654-6666

Attorneys for Porch.com, Inc.

# EXHIBIT A



# Reinsurance Intermediary Authorization Agreement

Effective upon execution, Willis Re Inc. (hereinafter referred to as "Willis Re") is authorized to procure and administer reinsurance, the specifics of which are outlined in the Reinsurance Contract(s) which shall be attached hereto upon issuance, on behalf of Homeowners of America Insurance Company its affiliates and/or subsidiaries (hereinafter collectively referred to as the "Company"). It is agreed that Willis Re shall:

1. Render periodic accounts to the Company detailing all material transactions, including information necessary to support all commissions, charges, and other fees received by or owing to Willis Re.
2. Remit all funds due to the Company within thirty (30) days of receipt.
3. Hold all funds collected for the Company's account in a fiduciary capacity in a qualified U. S. financial institution, as defined by the National Association of Insurance Commissioners. It is agreed that fees charged by such financial institution for standard services shall be paid by Willis Re and interest on said funds shall accrue to Willis Re.
4. Maintain all records to identify the Company's ownership interest in such funds held in a fiduciary capacity and provide copies of those records to the Company upon request.
5. Retain for at least ten (10) years such records, in relationship to the reinsurance placed and serviced, as may be required by statute or regulation in the states in which the Company conducts business, including but not limited to:
   a. The contract, limits, underwriting restrictions, classes of risks and territory;
   b. Period of coverage, including effective and expiration dates, cancellation provisions and notice required of cancellation;
   c. Reporting and settlement requirements of balances;
   d. Rate used to compute the reinsurance premium;
   e. Names and addresses of assuming reinsurers;
   f. Rates of all reinsurance commissions, including commissions on retrocessions handled by Willis Re;
   g. Related correspondence and memoranda;
   h. Proof of placement;
   i. Details regarding retrocessions handled by Willis Re including the identity of retrocessionaires and percentage of each contract assumed or ceded;
   j. Financial records, including but not limited to, premium and loss accounts; and,
   k. When Willis Re procures a reinsurance contract on behalf of a licensed ceding insurer:
      i. Directly from any assuming reinsurer, written evidence that the assuming reinsurer has agreed to assume the risk; or
      ii. If placed through a representative of the assuming reinsurer, other than an employee, written evidence that such reinsurer has delegated binding authority to the representative.
6. Allow the Company access, during normal working hours, and the right to copy and audit, all accounts and records maintained by Willis Re related to the reinsurance placed and serviced. Willis Re will maintain such records in a form usable by the Company.
7. Disclose to the Company any relationship of an ownership nature with any reinsurer to which reinsurance will be placed and serviced.
8. Provide annually to the Company a statement of financial condition, audited by a Certified Public Accountant.
9. Comply with the written standards established by the Company for the cession or retrocession of all risks.

10. Comply with supplemental authorization agreement provisions as required by specific state code and these provisions are hereby incorporated in this Agreement by reference.

11. Comply with U.S., E.U., U.K., and any other applicable economic or trade sanctions laws. Willis Re will not provide any services under this Agreement if such activities would cause Willis Re to violate applicable economic or trade sanctions laws and, other terms and conditions of this Agreement notwithstanding, may terminate this Agreement in its entirety if Willis Re deems such termination necessary to comply with applicable law. Willis Re cannot provide advice to you on your obligations or those of underwriters or any other party under applicable economic or trade sanctions laws. The Company should consider obtaining independent legal advice regarding applicable economic or trade sanctions laws. The Company will promptly advise Willis Re if any risk covered or any claim or payment made under any reinsurance contract placed and serviced by Willis Re on your behalf involves operations or activities prohibited by, or persons or entities sanctioned under, U.S., E.U., U.K. or any other applicable economic or trade sanctions laws.

12. Earn and be entitled to one hundred percent (100%) of the brokerage generated by each reinsurance contract Willis Re places on behalf of the Company, at the time of placement of each such reinsurance contract. All brokerage generated by each reinsurance contract placed by Willis Re on behalf of the Company is deemed to be fully earned by Willis Re at the time of placement of each reinsurance contract.

13. Provide "Administrative Services", as defined below, in connection with reinsurance contracts placed by Willis Re. By separate, written, express mutual agreement between Willis Re and the Company, Willis Re may assume responsibility for providing Administrative Services in connection with reinsurance contracts placed by reinsurance intermediaries other than Willis Re ("Prior Contracts"). However, Willis Re will not provide any Administrative Services in connection with Prior Contracts without separate, written, express mutual agreement between Willis Re and the Company. In the event Willis Re is terminated by the Company as its Broker of Record for the placement of reinsurance, Willis Re will only maintain responsibility for providing Administrative Services in connection with reinsurance contracts placed by Willis Re, as reinsurance intermediary for the Company, unless otherwise separately and expressly agreed in writing between Willis Re and the Company. Willis Re will stop providing Administrative Services in connection with Prior Contracts within thirty (30) days after the date of termination of Willis Re as reinsurance intermediary Broker of Record for the Company. Willis Re will not retain any administrative responsibilities in connection with Prior Contracts after the expiration of the thirty (30) day period referenced in the previous sentence.

"Administrative Services", as used herein means all servicing duties customarily performed by a reinsurance intermediary-broker after the placement of the reinsurance contract, including but not limited to: 1) preparing and handling, through completion of the signing process, reinsurance contracts and any addenda thereto; 2) processing all notices received; 3) subject to applicable law and the terms and conditions of Section 11 of this Agreement, reporting and collecting all valid claim payments requested by the Company; 4) administering all open claims, claims which become reopened and claims yet to be reported by the Company and 5) administering all reserve funding. Administrative Services will be provided subject to applicable law and the terms and conditions of Section 11 of this Agreement.

The Company may terminate Willis Re's authority at any time upon furnishing written notice of such termination to Willis Re.

| | PRESIDENT | 11/6/17 |
|---|---|---|
| SIGNATURE | TITLE | DATE |

**Homeowners of America Insurance Company**

| | , COO | 11/6/17 |
|---|---|---|
| SIGNATURE | TITLE | DATE |

**WILLIS RE INC.**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Daniel Wilson on behalf of Daniel Wilson
Bar No. 24070859
dwilson@susmangodfrey.com
Envelope ID: 87541611
Filing Code Description: Original Petition
Filing Description:
Status as of 5/13/2024 7:29 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Stephen E.Morrissey | | smorrissey@susmangodfrey.com | 5/8/2024 8:04:17 PM | SENT |
| Kemper Diehl | | kdiehl@susmangodfrey.com | 5/8/2024 8:04:17 PM | SENT |
| Michelle  Wimmer | | mwimmer@susmangodfrey.com | 5/8/2024 8:04:17 PM | SENT |
| Daniel Wilson | 24070859 | dwilson@susmangodfrey.com | 5/8/2024 8:04:17 PM | SENT |

FILED
5/13/2024 5:12 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Belinda Hernandez DEPUTY

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP

SUITE 5100
1000 LOUISIANA STREET
HOUSTON, TEXAS 77002-5096
(713) 651-9366
FAX (713) 654-6666
WWW.SUSMANGODFREY.COM

<table>
<tr><td>SUITE 1400<br>1900 AVENUE OF THE STARS<br>LOS ANGELES, CALIFORNIA 90067-6029<br>(310) 789-3100</td><td>SUITE 3000<br>401 UNION STREET<br>SEATTLE, WASHINGTON 98101-2683<br>(206) 516-3880</td><td>ONE MANHATTAN WEST<br>NEW YORK, NEW YORK 10001-8602<br>(212) 336-8330</td></tr>
</table>

DANIEL WILSON
DIRECT DIAL (713) 655-5627

E-MAIL DWILSON@SUSMANGODFREY.COM

May 13, 2024

***Via Electronic Filing***
The Clerk of Court
The 160th District Court for Dallas County, Texas
The Honorable Aiesha Redmond, presiding
600 Commerce Street, 6th Floor, New Tower
Dallas, TX 75202

Re:     Cause No. DC-24-06658, *Porch.com, Inc. v. Arthur J. Gallagher & Co. and Gallagher Re, Inc. f/k/a Willis Re Inc.*, in the 160th Judicial District Court for Dallas County, Texas.

Dear Sir or Madam:

Under cover of this letter, our firm is tendering the fees required for (1) citations to serve the two defendants in the above-styled and numbered cause, (2) fees for Texas Secretary of State service upon defendant Arthur J. Gallagher & Co., and (3) the associated copy fees for the copies of the documents accompanying each citation.

Please do not hesitate to contact me with any questions or comments regarding this matter.

Sincerely,

*/s/ Daniel Wilson*

Daniel Wilson

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Daniel Wilson on behalf of Daniel Wilson
Bar No. 24070859
dwilson@susmangodfrey.com
Envelope ID: 87687108
Filing Code Description: Request
Filing Description:
Status as of 5/19/2024 9:57 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Daniel Wilson | 24070859 | dwilson@susmangodfrey.com | 5/13/2024 5:12:40 PM | SENT |
| Michelle  Wimmer | | mwimmer@susmangodfrey.com | 5/13/2024 5:12:40 PM | SENT |
| Stephen E.Morrissey | | smorrissey@susmangodfrey.com | 5/13/2024 5:12:40 PM | SENT |
| Kemper Diehl | | kdiehl@susmangodfrey.com | 5/13/2024 5:12:40 PM | SENT |

FORM NO. 353-3—CITATION

# THE STATE OF TEXAS

**ESERVE**

## CITATION

**To:**  **ARTHUR J GALLAGHER & CO GALLAGHER RE INC F/K/A WILLIS RE INC**
**SERRVE PRENTICE-HALL COPORATION SYSTEM**
**211 E 7TH STREET STE 620**
**AUSTIN TX  78701**

No.: **DC-24-06658**

GREETINGS:

You have been sued.  You may employ an attorney.  If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. on the Monday next following the expiration of twenty days after you were served this citation and **ORIGINAL** petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk.  Find out more at TexasLawHelp.org. Your answer should be addressed to the clerk of the **160th District Court** at 600 Commerce Street, Dallas, Texas 75202.

Said Plaintiff being **PORCH.COM, INC**

Filed in said Court  **8th day of May, 2024** against

**ARTHUR J. GALLAGHER & CO., GALLAGHER RE INC.  F/K/A WILLIS RE INC**

For Suit, said suit being numbered **DC-24-06658,** the nature of which demand is as follows:
Suit on **CNTR CNSMR COM DEBT** etc. as shown on said petition, a copy of which accompanies this citation.  If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office  **on this the 22nd day of May, 2024**

ATTEST: FELICIA PITRE,
Clerk of the District Courts of Dallas County, Texas

By _Cynthia Robinson_ , Deputy
**CYNTHIA ROBINSON**



**PORCH.COM, INC**
vs.
**ARTHUR J. GALLAGHER & CO.,, et al**

**ISSUED**
on this the 22nd day of May, 2024

**FELICIA PITRE**
**Clerk District Courts,**
**Dallas County, Texas**

By: **CYNTHIA ROBINSON**, Deputy

**Attorney for Plaintiff**
**DANIEL ALLEN WILSON**
**1000 LOUISIANA ST STE 5100**
**HOUSTON TX  77002-5096**
**713-651-9366**
dwilson@susmangodfrey.com

**DALLAS COUNTY**
**SERVICE FEES**
**NOT PAID**

**OFFICER'S RETURN**

Cause No. DC-24-06658

Court No.: 160th District Court

Style: PORCH.COM, INC
 vs.
ARTHUR J. GALLAGHER & CO, et al

Came to hand on the _____day of _____, 20_____, at _____o'clock _____.M.
Executed at _____, within the County of _____ at _____
o'clock _____ .M. on the _____day of_____, 20_____, by delivering to the within named
_____
_____
each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of
delivery.  The distance actually traveled by me in serving such process was _____miles and my fees are as follows:      To certify which
witness my hand.

|  | | |
|---|---|---|
| For serving Citation | $_____ | _____ |
| For mileage | $_____ | of_____ County, _____ |
| For Notary | $_____ | By_____ Deputy |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____ before me this_____ day of _____,

20_____, to certify which witness my hand and seal of office.

_____
Notary Public_____ County_____



160TH JUDICIAL DISTRICT COURT
GEORGE L. ALLEN COURTS BUILDING
600 COMMERCE STREET
DALLAS, TEXAS 75202-4604
214-653-7273

6/4/2024

DANIEL ALLEN WILSON
1000 Louisiana St Ste 5100
Houston TX  77002-5096

DC-24-06658
PORCH.COM, INC  vs.  ARTHUR J. GALLAGHER & CO.,, et al

DISMISSAL HEARING NOTICE – **BY SUBMISSION**

The above case is set for dismissal for want of prosecution **BY SUBMISSION on** 07/09/2024 at 3:00 PM. in the 160th District Court, Dallas County, Texas.

If you have perfected service and no answer has been filed, you must have moved for or have proved up a default judgment on or prior to the above date. Failure to do so prior to dismissal hearing will automatically result in the dismissal of the case on the above date and time and place.

If you have not perfected service on all parties prior to said dismissal date, you must **APPEAR BY SUBMISSION FOR THE DISMISSAL HEARING.** During said hearing you will have the opportunity to show by way of verified motion, good cause for maintaining the case on the docket. The court **SHALL** dismiss for Want of Prosecution unless there is a showing of good cause.

Sincerely

/s/ Nicholas Zaragoza
Nicholas Zaragoza,
Court Coordinator